[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10110

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 14, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00471-CV-J-20-HES-TEM

IN RE: SUPERIOR CONSTRUCTION COMPANY, INC.,
as the owner pro hac vice of the vessel, "Barge Mobro 605,"
in a cause of action of exoneration from, or limitation of, liability,

Consolidated In Re:-Appellant,

versus

CHARLES BROCK, ROBERT BOWERS, et al.,

Claimants-Appellees,

JIMMIE WHITE,

Claimant-Consolidated Claimant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 14, 2006)**

Before BLACK, HULL and FARRIS[*], Circuit Judges.

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

BLACK, Circuit Judge:

On December 29, 2001, a pleasure boat carrying 12 passengers allided[1] with Appellant Superior Construction Co.'s (Superior) stationary barge. After a bench trial, the district court found Superior liable to the pleasure boat's injured passengers and awarded a total judgment of $19,214,689.63 in economic and non-economic damages. We affirm.

## I. BACKGROUND

Although the district court made extensive findings, we set forth only the findings necessary to place the issues in context. Superior was the general contractor for the Florida Department of Transportation's project to widen and expand the Blanding Boulevard Bridge (the Bridge) over the Cedar River in Jacksonville, Florida. To assist with the project, Superior entered into a bareboat charter agreement[2] with Mobro Marine, Inc. (Mobro Marine), for use of (1) a 128-

---

[1] An *allision* is "[t]he sudden impact of a vessel with a stationary object such as an anchored vessel or a pier." *Black's Law Dictionary* 75 (7th ed. 1999). A *collision*, on the other hand, is "[t]he crashing together of two vessels." *Id.* at 258. Because Appellees' moving vessel crashed into Superior's stationary vessel, we will refer to the December 29, 2001, incident as an allision. Regardless, for purposes of this appeal, the distinction between "allision" and "collision" does not have any bearing on our legal analysis.

[2] Under a bareboat charter, also known as a demise charter, "the shipowner surrenders possession and control of the vessel to the charterer, who then succeeds to many of the shipowner's rights and obligations." *Black's Law Dictionary*, *supra*, at 228–29. The charterer—in this case Superior—is known as the "*owner pro hac vice*" of the chartered vessel. *See id.* at 229 (emphasis in original).

foot long, 38.5-foot wide, and 7-foot deep barge called the Mobro 605 (the Barge); and (2) a 36-foot long, 14.5-foot wide, and 4-foot deep tugboat called the Mary Anne (the Tug). The Barge is painted completely black, as are the Tug's hull and lower superstructure.

Mobro Marine furnished the Barge to Superior without any permanent or fixed navigational or mooring lights; thus, Superior devised its own lighting scheme. Superior's lighting plan called for a total of ten lights positioned on strategic sections of the Barge, and two lights on the Tug's stern.[3] On the night of the allision, however, only three of the ten lights on the Barge, and one of the two lights on the Tug, actually worked. Two of the Barge's three functioning lights were flashing white lights and one was an extremely dim light described by an eye-witness as "looking like a bathroom nite-light or a distant porch light." The Tug's one operational light was a flashing white light. These four lights—which were old, scratched, sun-damaged, rust-stained, dirty, and generally in poor condition—provided the only illumination of the Barge and the Tug.

The Bridge's 528-foot wide passageway is divided into multiple spans by support pilings that rise out of the water and connect to the Bridge's underside.

---

[3] Superior's and Appellees' expert witnesses agreed neither the Inland Navigation Rules, 33 U.S.C. §§ 2001–2038, nor the Annex to those Rules, 33 C.F.R. §§ 84–88, address the lighting of a barge that is tied to a bridge under construction.

Although the U.S. Coast Guard has not designated a specific section of the Cedar River as a federally-marked channel, recreational boaters generally pass through one of three spans located on the Bridge's northwest end. The support pilings on the edges of these three spans have been unofficially marked with spray-painted arrows. This generally-recognized travel channel possesses deeper water and best enables recreational boaters to safely navigate their vessels beneath the Bridge. During the six months of construction work preceding the allision, Superior not only saw the spray-painted arrows, but also witnessed recreational boaters traveling through the channel at speeds as high as 70 miles per hour (mph) both day and night.

Throughout the project, Superior usually stationed the Barge and the Tug such that recreational boaters could safely pass through the Bridge's commonly used spans. On December 29, 2001, however, Superior tied the Barge to the base of the Bridge so that it ran parallel to the Bridge and blocked all but 38 feet of the 120-foot wide channel—i.e., two of the three spans commonly used by recreational boaters. It then moored the Tug perpendicular to the Barge's midship, such that the Barge and the Tug essentially formed a "T"-shape. Although Superior's employees could have removed the Barge and the Tug from the channel within 15 to 20 minutes, they instead opted to leave the vessels in this location and

4

head home for the holiday weekend. Moreover, Superior never checked to see what the Barge and the Tug looked like from the water after dark. Upon nautical twilight at 6:29 p.m., the Barge's black color, inadequate lighting, and unorthodox location rendered it virtually invisible to recreational boaters on the Cedar River.

That same evening, Appellees Robert Bowers, Tammy Bowers, Charles Brock, Cynthia Tipton, Jimmie White, Betty Wright, and Connie Wright attended a family gathering at a house located near the Cedar River.[4] During this gathering, several attendees, including Brock, consumed alcoholic beverages. After sunset, Brock invited eleven of the gathering's attendees to go for a ride on his 25-foot long, 8-foot wide pleasure boat (the Boat).

As the Boat approached the Bridge at approximately 6:52 p.m., Brock slowed the Boat's speed from 34 mph to 22 mph and aimed the Boat to travel through one of the three commonly used spans. Brock had frequently driven the Boat under the Bridge at night and, given Superior's usual practice of stationing the Barge and the Tug to allow safe passage through the travel channel, he had no

---

[4] Appellee Jim Tipton did not attend the family gathering, and, consequently, neither rode on the Boat nor suffered physical injuries arising from the allision. Rather, he received non-economic damages for loss of consortium stemming from the severe injuries his wife, Cynthia, sustained in the allision.

reason to suspect the vessels' unorthodox location.[5]  He and his fellow

passengers—including the three passengers sitting on the bow who were not

intoxicated and who enjoyed a completely unobstructed view of the upcoming

Bridge—could not see the Barge until it was too late to avoid the allision.

Consequently, the Boat slammed into the Barge, throwing the passengers forward

and causing serious injuries.  A blood sample drawn from Brock roughly three and

a half hours after the allision indicated his blood alcohol level (BAL) exceeded the

legal limit set forth under 33 C.F.R. § 95.020 and Florida Statutes § 327.35.[6]

On June 27, 2002, Superior, as the owner *pro hac vice* of the Barge and the

Tug, brought an admiralty action in federal district court for exoneration from or

limitation of liability, pursuant to the Limitation of Liability Act.  *See* 46 U.S.C.

§§ 183–189.  Appellees contested Superior's right to exoneration from or

---

[5]  Brock testified that, during one of his prior trips under the Bridge, he had noticed the Barge stationed on the Bridge's south end.  Additionally, the one time he previously saw the Barge at night, Superior had illuminated it with light plants and he spotted it from a considerable distance away.  On the night of the allision, however, the Barge was located on the Bridge's north end and Superior had not utilized light plants.

[6]  Under Florida and federal law, it is unlawful to operate a recreational boat while having a BAL of 0.08 or more.  Fla. Stat. § 327.35; 33 C.F.R. § 95.020.  Roughly 3.5 hours after the allision, Brock's BAL was 0.112.  At trial, Appellees presented an expert witness who asserted the severe internal injuries Brock suffered may have caused his BAL to *increase* between the allision and the blood draw.  Superior countered with an expert witness who stated the 3.5-hour time gap may have meant Brock's BAL *decreased* between the allision and the blood draw.  Rather than expressly resolve this factual dispute, the district court assumed Brock violated 33 C.F.R. § 95.020 and Florida Statutes § 327.35, but nevertheless found Brock's legal intoxication was not a cause of the allision.

limitation of liability. Additionally, Appellees asserted in personam claims against Superior, and in rem claims against the Barge and the Tug, under admiralty and maritime law.[7]

Following a bench trial, the district court determined Superior was not entitled to exoneration from or limitation of liability under the Limitation of Liability Act. Additionally, the district court (1) found Superior, the Barge, and the Tug liable for Appellees' injuries,[8] (2) determined none of the Appellees were comparatively at fault, and (3) awarded Appellees a total of $19,214,689.63 in economic and non-economic damages.[9] This appeal ensued.

On appeal, Superior argues the district court erred when it found the Barge obstructed navigation in violation of 33 U.S.C. § 409, placed a presumption of

[7] Mobro Marine also brought an action for exoneration from or limitation of liability under the Limitation of Liability Act, and Appellees counterclaimed against Mobro Marine. On January 26, 2004, the district court dismissed all claims filed by and against Mobro Marine because the parties resolved these claims in mediation. Mobro Marine is thus not a party to this appeal.

[8] Although Appellees' injuries stemmed solely from the Boat's allision with the Barge, the district court also placed liability on the Tug. Specifically, the district court determined the Barge was an unpowered "passive instrument" that relied on the Tug's "dominant mind" for propulsion and lighting. The district court thus found "the Tug was the 'controlling vessel' and is liable for damages, even if [Appellees'] boat did not strike the Tug until after the injuries occurred." Superior does not challenge this conclusion on appeal.

[9] The district court awarded $3,000,218 to Robert Bowers, $1,249,911.23 to Tammy Bowers, $770,841.83 to Charles Brock, $1,925,504.69 to Cynthia Tipton, $250,000 to Jim Tipton, $3,317,277 to Jimmie White, $8,600,000.57 to Betty Wright, and $100,936.31 to Connie Wright (on behalf of her minor son, Ashton Wright).

fault on Superior under the *Pennsylvania* Rule, and determined Superior failed to show its violation could not have been a cause of the allision.  Superior also contends the district court erred when it determined Appellees satisfied their burden under the *Pennsylvania* Rule of showing Brock's legal intoxication could not have been a cause of the allision, and, consequently, refused to apportion a percentage of fault to Appellees.  Additionally, Superior asserts the district court clearly erred in determining the total damages it awarded to Appellees Tammy Bowers and Jimmie White.

## II.  STANDARDS OF REVIEW

In an action tried without a jury, the district court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  Fed. R. Civ. P. 52(a).  Likewise, we review for clear error a district court's findings on the questions of statutory fault, negligence, causation, and damages.  *See Am. Dredging Co. v. Lambert*, 153 F.3d 1292, 1295 (11th Cir. 1998); *Simmons v. Conger*, 86 F.3d 1080, 1084 (11th Cir. 1996); *Orange Beach Water, Sewer & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1380 (11th Cir. 1982).  We will not find the district court committed clear error unless, "after assessing the evidence, [we are] left with a definite and firm conviction that a mistake has been committed."

*Worthington v. United States*, 21 F.3d 399, 400 (11th Cir. 1994) (quotations and citations omitted). "We review the district court's conclusions of law de novo." *Am. Dredging Co.*, 153 F.3d at 1295.

## III. ANALYSIS

A. *Legal Framework for Cases Involving the* Oregon *and* Pennsylvania *Rules*

This appeal implicates two common law burden-shifting presumptions invoked when a moving vessel allides with a stationary vessel. First, the *Oregon* Rule creates a rebuttable presumption of fault against a moving vessel that, under its own power, allides with a stationary object. *The Oregon*, 158 U.S. 186, 197, 15 S. Ct. 804, 809 (1895).[10] "This presumption of negligence may be rebutted by showing, by a preponderance of the evidence, either that the allision was the fault of the stationary object, that the moving vessel acted with reasonable care, or that the allision was an unavoidable accident." *Bunge Corp. v. Freeport Marine Repair*, 240 F.3d 919, 923 (11th Cir. 2001). Second, under the *Pennsylvania* Rule,

---

[10] The *Oregon* Rule should not be confused with the *Louisiana* Rule. *See The Louisiana*, 70 (3 Wall.) U.S. 164, 173 (1866). Although both of these rules place a presumption of fault on a moving vessel that allides with a stationary object, the *Oregon* Rule applies to vessels moving under their own power when they allide with a stationary object, whereas the *Louisiana* Rule applies to vessels that drift into a stationary object. *See Chicago v. M/V Morgan*, 375 F.3d 563, 572 n.7 (7th Cir. 2004) (differentiating between the *Oregon* Rule and the *Louisiana* Rule).

9

> when . . . a ship at the time of a[n allision] is in actual violation of a statutory rule intended to prevent [allisions], it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873). The *Pennsylvania* Rule "is not a rule of liability, but shifts the burden of proof as to causation. This burden is strict, but it is not insurmountable." *Orange Beach*, 680 F.2d at 1381 (citations omitted).

Because Appellees' boat, moving under its own power, allided with Superior's stationary barge, Superior argues the *Oregon* Rule should apply to Appellees. Appellees, on the other hand, assert the *Pennsylvania* Rule should apply to Superior because it violated 33 U.S.C. § 409, a statute intended to prevent allisions, by obstructing navigation. We must thus briefly review the interplay between the *Oregon* and *Pennsylvania* Rules.

In cases where a stationary vessel violates a statute intended to prevent allisions and a moving vessel allides with that stationary vessel, we apply the burden-shifting analysis set forth in *Sunderland Marine Mutual Insurance Co. v. Weeks Marine Construction Co.*:

10

> The general rule is that the presumption of fault for the allision lies against the moving vessel [(i.e., *Oregon* Rule)]. This burden of proof shifts, however, to the stationary vessel when the stationary vessel is in violation of a statutory rule intended to prevent accidents [(i.e., *Pennsylvania* Rule)]. The stationary vessel then bears the burden of proof in showing that its statutory violation could not have been a contributory cause of the allision.

338 F.3d 1276, 1279 (11th Cir. 2003) (citations omitted); *see also Parker Towing Co. v. Yazoo River Towing, Inc.*, 794 F.2d 591, 594 (11th Cir. 1986); *Orange Beach*, 680 F.2d at 1380–81. In short, the burden of proof initially rests with the moving vessel under the *Oregon* Rule. If the moving vessel can establish the stationary vessel violated a statutory rule intended to prevent allisions, however, then the *Pennsylvania* Rule shifts the burden to the stationary vessel.

Our overview of the applicable legal framework cannot end here, however, because Superior contends that, given Brock's legal intoxication, the Boat violated 33 C.F.R. § 95.020 and Florida Statutes § 327.35 (i.e., provisions intended to prevent allisions), and, therefore, the *Pennsylvania* Rule should also apply to Appellees.

> When both vessels involved in the allision are operating in violation of statutes designed to prevent such mishaps, the [*Pennsylvania*] rule requires "the district court to find that the statutory fault of both vessels contributed to the accident, unless it [finds] that the fault of either . . . could not have been a cause of the [allision]."

11

*Parker Towing Co.*, 794 F.2d at 594 (quoting *Otto Candies, Inc. v. MV Madeline D*, 721 F.2d 1034, 1036 (5th Cir. 1983)).  In other words, if each vessel successfully invokes the *Pennsylvania* Rule against its opponent, then each vessel must overcome a presumption of fault by showing its violation could not have been a cause of the allision.

If neither vessel can satisfy its burden under the *Pennsylvania* Rule, then the district court must "determine the comparative fault of each vessel and allocate liability for damages accordingly."  *Gele v. Chevron Oil Co.*, 574 F.2d 243, 250 (5th Cir. 1978) (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397, 408, 95 S. Ct. 1708, 1715–16 (1975)); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (stating Fifth Circuit decisions rendered prior to September 30, 1981, are binding precedent in our circuit); *see also Parker Towing Co.*, 794 F.2d at 594 (affirming (1) the district court's finding that both vessels failed to satisfy their burden under the *Pennsylvania* Rule and (2) its apportionment of damages between the vessels based on their respective degree of fault).  With this legal framework in mind, we proceed to the merits of Superior's appeal.

B.      *District Court's Application of the* Pennsylvania *Rule to Superior*

As indicated above, the *Oregon* Rule placed an initial presumption of fault on Appellees because their moving boat allided with Superior's stationary barge.

12

Based on our precedent, however, the district court determined Superior violated 33 U.S.C. § 409,[11] shifted the presumption of fault onto Superior under the *Pennsylvania* Rule, and found Superior could not satisfy its burden of proving its § 409 violation could not have been a cause of the allision. Superior argues the district court clearly erred when it found Superior violated § 409 and, consequently, erroneously applied the *Pennsylvania* Rule to Superior.[12] These errors, Superior asserts, "tainted the court's entire opinion with error and ultimately led to its erroneous and insupportable conclusion that Superior was entirely at fault for the accident."

Section 409 provides in relevant part: "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent

---

[11] Because we conclude the district court did not clearly err when it found Superior violated 33 U.S.C. § 409, we will not address the district court's alternative findings that Superior violated 33 C.F.R. §§ 84.15 and 88.13, and 33 U.S.C. § 2002.

[12] In the alternative, Superior contends a § 409 violation cannot invoke the *Pennsylvania* Rule because § 409 "does not set forth a clearly-delineated standard, but instead calls for interpretation and judgment as to what constitutes an 'obstruction' under the particular circumstances of each individual navigable channel." To support this assertion, Superior cites four cases from the Second and Fifth Circuits. *See Tokio Marine & Fire Ins. Co.*, 235 F.3d 963, 966 (5th Cir. 2001); *Interstate Towing Co. v. Stissi*, 717 F.2d 752, 757 (2d Cir. 1983); *In re Marine Sulphur Queen*, 460 F.2d 89, 98 (2d Cir. 1972); *Afran Transp. Co. v. United States*, 435 F.2d 213, 218 (2d Cir. 1970). Yet, these four cases never even mention § 409, let alone establish that district courts cannot apply the *Pennsylvania* Rule based on a § 409 violation. Moreover, regardless of other circuits' precedent, our circuit has repeatedly affirmed the district courts' use of § 409 violations to invoke the *Pennsylvania* Rule. *See Sunderland Marine*, 338 F.3d at 1279; *Self Towing, Inc. v. Brown Marine Servs., Inc.*, 837 F.2d 1501, 1504 (11th Cir. 1988); *Orange Beach*, 680 F.2d at 1380.

13

or obstruct the passage of other vessels or craft . . . ." District courts must determine whether a party violated § 409 "by reference to all the relevant facts and circumstances." *Orange Beach*, 680 F.2d at 1380. In *Orange Beach*, for example, the defendants moored two barges and a tug such that they blocked 40 percent of a waterway's bank-to-bank width and a portion of the 12-foot navigation channel. *Id.* at 1378. Additionally, the defendants moored their vessels "in close proximity to [a] pipeline crossing, at night, between two bends in the Waterway which were about a mile apart . . . , and rendered navigation by other vessels difficult in an area where they would normally be straightening out for the second bend." *Id.* at 1380. Given these relevant facts and circumstances, we concluded the district court did not clearly err by finding the defendants' mooring constituted an obstruction of navigation, in violation of § 409. *Id.*; *see also Sunderland Marine*, 338 F.3d at 1279 (upholding a district court's finding that a stationary barge violated § 409 based on expert testimony that the barge's location created a "navigational hazard").[13]

---

[13] Superior mischaracterizes our prior holdings when it claims that "[c]ase law interpreting section 409 has uniformly held that where there is room available for safe passage of vessels, there is no violation of 33 U.S.C. § 409." Our previous cases establish that district courts should *not* limit their § 409 analyses to the question of whether a stationary vessel's location permitted safe passage of moving vessels; rather, district courts must determine whether a vessel obstructed navigation "by reference to all the relevant facts and circumstances." *Orange Beach*, 680 F.2d at 1380; *see also Sunderland Marine*, 338 F.3d at 1279. In *Orange Beach*, for example, "[v]essels rounding the bends from either direction could pass" the defendants' moored

Four subsidiary findings support the district court's conclusion that Superior obstructed navigation in violation of § 409. First, Superior's 128-foot long Barge blocked roughly 24 percent of the 528-foot bank-to-bank width of the passageway beneath the Bridge. The parties do not dispute this finding. Second, Superior tied its Barge to the Bridge in a highly unorthodox location, obstructing roughly 82 feet (i.e., 68 percent) of the 120-foot travel passage generally accepted as the safest, and most commonly used, navigational channel for recreational boaters. Several local boaters testified they saw the Barge before sunset on the day of the allision and were "shocked" to discover its location. Additionally, Lieutenant Kevin L. Ivey of the U.S. Coast Guard's Marine Safety Office stated that if he had known the Barge's location on the evening of December 29, 2001, he would have broadcast a local notice to "alert the boating public of the barge's presence and position in the river." Third, Superior not only left the Barge and the Tug in this unexpected location after nautical twilight, but also failed to light the vessels adequately. Only four of the twelve lights Superior deemed necessary for lighting the Barge and the Tug actually functioned on the night of the allision, and,

---

vessels. 680 F.2d at 1378. Such availability of safe passage did not enable the defendants to evade § 409's reach, however, because, as we explained above, the other relevant facts and circumstances nevertheless indicated the moored vessels unlawfully obstructed navigation. *Id.* at 1380. Similarly, the fact Appellees' boat theoretically could have navigated around Superior's Barge did not automatically preclude the district court from finding Superior violated § 409.

according to several witnesses, these four lights were old, scratched, sun-damaged, rust-stained, dirty, and generally in poor condition.[14]  Indeed, one witness described the Barge's only non-blinking light as "looking like a bathroom nite-light or a distant porch light."  Based on these three findings, the district court reached a fourth finding:  at the time of the allision, the Barge and the Tug were virtually invisible from the water, eliminating any chance Appellees might have had to safely navigate around the vessels.  Superior's creation of such a navigational hazard, the district court concluded, constituted a violation of § 409.

After reviewing the record, we determine the district court had ample evidence to support its four subsidiary findings.  Furthermore, considering all the relevant facts and circumstances as required under *Orange Beach*, we conclude the district court did not clearly err when it found Superior obstructed navigation in violation of § 409, and, therefore, did not err by shifting the presumption of fault

---

[14]  Superior failed to preserve the lights aboard the Barge and the Tug on December 29, 2001, so the district court never had the opportunity to inspect these lights.  On appeal, Superior contends the district court committed clear error because it (1) found Superior disposed of the relevant lights in bad faith and, consequently, (2) drew "adverse inferences against Superior as to the condition of the actual lights that were in use when the accident occurred."  *See Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (stating "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith").  This argument lacks merit.  The district court's findings about the lights' generally poor condition derived from the testimony of several witnesses, not adverse inferences arising from Superior's alleged bad-faith spoliation of evidence.  Furthermore, although the district court stated "there is evidence of bad faith on the part of Superior warranting sanctions," it neither expressly held Superior acted in bad faith nor expressly drew adverse inferences regarding the quality of the relevant Barge and Tug lights.

onto Superior under the *Pennsylvania* Rule. Nor did the district court clearly err when it found Superior failed to satisfy its burden of showing its § 409 violation could not have been a cause of the allision. In fact, as we explain in greater detail below, the district court had ample evidence to conclude Superior's § 409 violation was the allision's *sole* cause. The district court accordingly did not clearly err when it found Superior liable to Appellees for damages arising from the allision.

C.      *District Court's Application of the* Pennsylvania *Rule to Appellees*

As discussed above, if a district court finds each vessel involved in an allision (1) violated a statute intended to prevent allisions and (2) failed to show its violation could not have been a cause of the allision, then the district court must determine the parties' comparative fault and apportion liability for damages accordingly. *See Parker Towing*, 794 F.2d at 594. After applying the *Pennsylvania* Rule to Superior and concluding Superior's § 409 violation was a cause of the allision, the district court considered Superior's argument that the *Pennsylvania* Rule also applied to Appellees. First, the district court assumed Brock violated 33 C.F.R. § 95.020 and Florida Statutes § 327.35, the Florida and

17

federal boating-under-the-influence (BUI) provisions,[15] and applied the

*Pennsylvania* Rule against Appellees.[16]  Second, the district court found Appellees

nevertheless satisfied their burden of showing Brock's legal intoxication could not

have been a cause of the allision.[17]  Based on this finding, it determined "any

evidentiary presumption created [under the *Pennsylvania* Rule] by Brock's blood

alcohol level . . . is overcome and vanishes due to the overwhelming evidence to

the contrary."

---

[15]  Appellees concede that 33 C.F.R. § 95.020 and Florida Statutes § 327.35 are "rule[s] intended to prevent [allisions]" for purposes of the *Pennsylvania* Rule.  *See The Pennsylvania*, 86 U.S. (19 Wall.) at 136.

[16]  As we explained in Footnote 6, *supra*, the parties' expert witnesses presented conflicting opinions as to whether Brock's BAL actually exceeded the Florida and federal limits at the time of the allision.  The district court did not expressly resolve this dispute.  Instead, it (1) assumed Brock violated 33 C.F.R. § 95.020 and Florida Statutes § 327.35, and (2) found Appellees nevertheless satisfied their burden under the *Pennsylvania* Rule of showing Brock's violation could not have been a cause of the allision.  Contrary to Superior's assertions, this analytical approach did not constitute an error of law.  *See Self Towing*, 837 F.2d at 1504 n.7 (approving the district court's approach of (1) assuming a vessel violated a statute intended to prevent allisions and (2) finding this vessel nevertheless satisfied its burden under the *Pennsylvania* Rule of showing its violation could not have been a cause of the allision).

[17]  Again, once a district court finds a vessel violated a statute intended to prevent allisions, the "burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it *could not have been*."  *The Pennsylvania*, 86 U.S. (19 Wall.) at 136 (emphasis added).  Superior asserts the district court applied the wrong standard under the *Pennsylvania* Rule because it repeatedly stated Brock's legal intoxication "*was not* a cause of the allision," rather than stating Brock's legal intoxication "*could not have been* a cause of the allision."  In other words, Superior invites us to transform "could not have been" into a talismanic phrase district courts must recite to correctly apply the *Pennsylvania* Rule.  We decline to do so.  As we explain below, the district set forth myriad facts and findings supporting its conclusion that Appellees satisfied their *Pennsylvania* Rule burden of proof.  Thus, even though the district court never uttered the phrase "could not have been" in its memorandum opinion, it did not fail to apply the *Pennsylvania* Rule against Appellees.

18

Superior forwards two primary challenges to the district court's finding that Brock's violation of 33 C.F.R. § 95.020 and Florida Statutes § 327.35 could not have been a cause of the allision. First, at oral argument, Superior claimed that, given Brock's legal intoxication, it was "impossible," as a matter of law, for the district court to find Appellees satisfied their evidentiary burden under the *Pennsylvania* Rule. Second, Superior argues that, even if it was legally possible for Appellees to satisfy their burden, the district court clearly erred when it found Brock's legal intoxication could not have been a cause of the allision. We will address these arguments in turn.

1. *Stringent, but Not Insurmountable, Presumption of Fault Under the* Pennsylvania *Rule*

As we stated above, the *Pennsylvania* Rule "is not a rule of liability, but shifts the burden of proof as to causation. This burden is strict, but it is not insurmountable." *Orange Beach*, 680 F.2d at 1381 (citations omitted). For more than 50 years, we have repeatedly stated:

> [T]he Supreme Court, in [*The Pennsylvania*], did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote.

19

*Compania de Maderas de Caibarien, S.A. v. The Queenston Heights*, 220 F.2d 120, 122–23 (5th Cir. 1955); *see also Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1555 (11th Cir. 1987); *Orange Beach*, 680 F.2d at 1381; *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1082–83 (5th Cir. 1979)*; China Union Lines, Ltd. v. A.O. Andersen & Co.*, 364 F.2d 769, 782 (5th Cir. 1966); *Parker Bros. & Co. v. De Forest*, 221 F.2d 377, 380–81 (5th Cir. 1955). In other words, district courts may not place an insurmountable presumption of fault on vessels that violate statutes intended to prevent allisions.

Despite our longstanding precedent, Superior, at oral argument, repeatedly argued it was "impossible," given Brock's intoxicated state, for the district court to find Appellees satisfied their *Pennsylvania* Rule burden. The gravamen of this argument is that, due to Brock's legal intoxication, the district court should have placed an insurmountable presumption of fault on Appellees under the *Pennsylvania* Rule and apportioned them a percentage of the liability.

After reviewing the relevant case law, we reject Superior's contention that district courts must always apportion some fault to a vessel whose operator was legally intoxicated at the time of the allision. No circuit has ever expressly held a BUI-law violation gives rise to an insurmountable presumption of fault under the *Pennsylvania* Rule. Indeed, to the best of our knowledge, no circuit has even

20

implicitly reached such a conclusion. Given the apparent non-existence of such persuasive authority, we are especially disinclined to establish a rule making it "impossible," as a matter of law, for district courts to find a boat driver's legal intoxication could not have been a cause of an allision.

Under *Compania de Maderas de Caibarien* and its progeny, we thus conclude BUI-law violations—like all other violations of statutes intended to prevent allisions—give rise to a stringent, but not insurmountable, presumption of fault. Needless to say, we condemn the dangerous practice of boating under the influence. We also recognize that, when a legally-intoxicated boat driver's vessel allides with a stationary vessel, the boat driver's legal intoxication will generally be a contributory cause of the allision. Yet, *generally* does not mean *always*. In rare cases, a district court may find, after carefully considering all the evidence, that a boat driver's legal intoxication simply could not have been a cause of the allision. Contrary to Superior's repeated assertions, therefore, it was not legally "impossible" for the district court to find Appellees satisfied their burden of proof under the *Pennsylvania* Rule.

2. *District Court's Finding that Brock's Legal Intoxication Could Not Have Been a Cause of the Allision*

21

This appeal involves one of the rare cases where a district court had ample evidence with which to determine a boat driver's legal intoxication could not have been a cause of the allision. Four primary findings support the district court's conclusion on this issue. First, Brock handled the Boat in such a way as to indicate his motor skills, mental faculties, and control of the Boat were not impaired due to intoxication. Appellees' expert witness, Captain George Kirk Greiner, Jr., supported this conclusion, testifying Brock's handling of the Boat was reasonable for a mariner and his intoxication did not play a role in the allision. Second, as Brock began to approach the Bridge, he slowed the Boat's speed from 34 mph to 22 mph—the safest speed for maneuvering the Boat. Unrefuted expert witness testimony bolsters this finding. Third, Brock perfectly aimed the Boat such that it would have passed safely under the Bridge if not for the unexpected location of the Barge. This finding draws support from not only the testimony of Captain Greiner and Appellee Robert Bowers, but also the relevant physical evidence and measurements. Fourth, and most important to our decision, passengers on the Boat who (1) were not legally intoxicated and (2) looked ahead with a completely unobstructed view of the upcoming Bridge could not see the virtually invisible Barge until it was impossible to avoid the allision or even significantly reduce the force of the impact. For example, Appellee White, who

22

was sitting on the Boat's bow, testified that from the time the Barge became visible to the time of the allision, he barely had enough time to shout "Barge—Jump!" and immediately roll overboard. When he tumbled into the water, the Boat was already so close to the Barge that his body struck the Barge. Given these four key findings, each of which rests on sufficient record evidence, the district court concluded Brock's legal intoxication could not have been a cause of the allision.

After considering all of the evidence, we hold the district court did not clearly err when it determined Appellees satisfied their burden of proof under the *Pennsylvania* Rule. In fact, the district court had ample evidence to support its conclusion that the allision's sole cause was "Superior's dangerous placement, improper lighting, and failure to make any attempt to alert the Coast Guard or to warn the boating public that a huge, black, unlit Barge and Tug would be blocking travel channels popular with local boaters at night." The district court thus did not clearly err when it found Brock's legal intoxication could not have been a cause of the allision and, therefore, did not err by refusing to apportion liability for damages between Superior and Appellees.[18]

---

[18] Superior argues that, even if Brock's intoxication could not have been a cause of the allision, he was nevertheless comparatively negligent for failing to give safety instructions to his passengers, designate a lookout, require all of the passengers to wear life jackets, and take

D.    *Appellees Tammy Bowers' and Jimmie White's Economic and Non-Economic Damages*

Finally, Superior asserts the district court clearly erred by awarding

Appellees Tammy Bowers and Jimmie White damages so excessive as to "shock

the conscience." As suggested in Part II, "in an admiralty action, the trial court's

findings of damages are matters of fact and should be affirmed if not clearly

erroneous." *Fla. E. Coast Ry. v. Revilo Corp.*, 637 F.2d 1060, 1067 (5th Cir.

1981). When determining whether a district court's damages award constituted

clear error, "we must be especially careful about reversing findings of fact based

on the district court's evaluation of live witness testimony because the district

court is 'better positioned' to evaluate such evidence." *Lindsey v. Navistar Int'l.*

*Transp. Corp.*, 150 F.3d 1307, 1319 (11th Cir. 1998).

As an initial matter, we note the district court did not state the specific

findings underlying Bowers' and White's economic and non-economic damages.

Generally, where a district court fails to make sufficient findings to permit

adequate appellate review of a claim for damages, a remand for the appropriate

---

various other safety measures. Additionally, Superior contends Appellees Robert Bowers, Cynthia Tipton, and Jimmie White were comparatively negligent for riding on the Boat's bow. After carefully reviewing the record, we conclude the district court did not clearly err when it found Brock, Bowers, Tipton, and White neither caused the accident nor contributed to the extent of their own injuries. We thus reject Superior's alternative arguments for allocating a percentage of fault to one or more Appellees.

findings is the normal procedure. *See Self*, 832 F.2d at 1549. We will not remand for appropriate findings, however, "if a complete understanding of the issues is possible in the absence of separate findings and if there is a sufficient basis for [our] consideration of the merits" of the district court's damages award. *See id.* Because the record provides us a complete understanding of the issues and a sufficient basis for considering the merits of the damages awarded to Bowers and White, we need not remand to the district court for additional findings. Instead, we will review the record to determine whether the district court clearly erred when it awarded total damages of $1,249,911.23 to Tammy Bowers and $3,317,277 to Jimmie White.

1.     *Tammy Bowers*

Bowers' expert witness, Dr. M.W. Kilgore, testified that, as a result of the allision, Bowers suffered a ligament tear in her right hip; a scar on her lip and right cheek; two disk herniations in her cervical spine; musculoskeletal and soft-tissue injuries in her neck and lower back; and a concussion, which has given rise to recurring migraine headaches. According to another of Bowers' expert witnesses, Professor Paul Mark Mason, these injuries created the need for a total present-value amount of $423,834.28 in future medical expenses. After hearing this testimony, the district court awarded Bowers $249,911.23 in economic

25

damages—an amount considerably lower than Bowers' expert witness's estimate. Considering the testimony of Bowers' expert witnesses, we conclude the district court's economic damages award was not clearly erroneous.

As for non-economic damages, Bowers and/or her expert witnesses testified about such issues as (1) the hardship she endured while financially supporting and caring for her husband and their two children during her husband's prolonged recovery from his debilitating, allision-related injuries, (2) the ongoing hip, neck, and back pain and migraine headaches stemming from her injuries, (3) the permanent disfigurement of her lip and right cheek, and (4) the permanent ligament tear in her right hip that will likely continue to deteriorate. The district court awarded her $1,000,000 in non-economic damages. Given the testimony about the hardship and suffering she experienced, and continues to experience, as a result of the allision, we cannot say the district court committed clear error in awarding her this non-economic damages amount.

2. *Jimmie White*

According to White's expert witnesses, Dr. Christopher Roberts, the allision caused him to suffer such short-term injuries as a broken rib, a cervical neck injury, and a forehead laceration. Moreover, Dr. Roberts testified that White sustained permanent neurological injuries to his lumbar spine, which cause him

26

chronic, persistent pain in various parts of his body and necessitate lifelong pain management treatment. Professor Mason estimated White's pain management treatments for his neurological injuries equate to a present-value cost of $1,939,781 in future medical expenses. Following this testimony, the district court awarded White $1,317,277 in economic damages—again, a figure well below White's expert witness's estimate. We determine the district court did not clearly err in awarding him this economic damages amount.

Turning to White's non-economic damages, we note White testified about (1) the trauma he experienced during the allision (e.g., regaining consciousness underwater and having to overcome pain, bleeding, and cold temperatures to swim to safety); (2) the loss of independence and frustration stemming from his physical inability to pursue his previous career as a self-employed drywall installer; and (3) the suffering associated with a lifetime of severe, constant neurological pain that afflicts multiple parts of his body. The district court awarded White $2,000,000 in non-economic damages, and we conclude the record contains ample evidence to support this amount.

In summary, although the district court's total damages awards are substantial, "in view of all the circumstances, we cannot say that the district court, which heard all of the testimony and saw all of the evidence, committed clear

27

error" in awarding $1,249,911.23 to Bowers and $3,317,277 to White. *See*

*Lindsey*, 150 F.3d at 1319. We therefore reject Superior's challenges to Bowers'

and White's total damages.

## IV. CONCLUSION

The district court did not clearly err when it found Superior violated § 409

and failed to satisfy its *Pennsylvania* Rule burden of showing its violation could

not have been a cause of the allision. Nor did the district court clearly err when it

found Appellees met their *Pennsylvania* Rule burden of showing Brock's violation

of 33 C.F.R. § 95.020 and Florida Statutes § 327.35 could not have been a cause

of the allision. Therefore, the record contains ample evidence to support the

district court's conclusion that Superior was solely liable for the allision and

Appellees' resulting injuries. The district court also did not clearly err in

awarding total damages of $1,249,911.23 to Bowers and $3,317,277 to White. We

accordingly affirm the district court's judgment.

AFFIRMED.

28