792 F.2d 1081
 Carolyn S. DALEY, etc., Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant,
and
Leon Canady, et al., Third-Party Defendants.
The FLORIDA NATIONAL BANK AT LAKELAND, etc., Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant,
and
Leon Canady, et al., Third-Party Defendants.
Ann MELLISH, etc., Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant,
and
Leon Canady, et al., Third-Party Defendants.
 No. 85-3445.
 United States Court of Appeals,
Eleventh Circuit.
 July 3, 1986.
Corrected Opinion.
 
 Cecile Hatfield, U.S. Dept. of Justice, Torts Branch, Civil Div., and M. Timothy Conner, Office of General Counsel, U.S. Dept. of Commerce, Washington, D.C., for defendant-appellant.
 Joel D. Eaton, Miami, Fla., Jeffery L. Shibley, Tampa, Fla., and John W. Frost, II, Bartow, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY and KRAVITCH, Circuit Judges, and HENLEY*, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 These consolidated actions arose out of the fatal crash of a Twin Beechcraft airplane, number N65V (N65V), which collided with a guy wire of a television antenna tower while attempting, with an inoperative engine, to execute a missed approach from runway 28 of the Gainesville Regional Airport, Gainesville, Florida. Appellees, the personal representatives of the estates of the pilot and passengers who were killed in the crash, sued the United States for wrongful death under the Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b), 2671-2680 (1982), alleging Federal Aviation Administration air traffic controller negligence.[1] Following a bench trial, the district court found that the failure of the air traffic controllers at Gainesville to ascertain the location of N65V, after it reported engine failure on the missed approach, and to warn the pilot of N65V's unsafe proximity to the television towers was negligence and a proximate cause of the crash. We affirm.
 
 I.
 
 2
 In the early morning of October 20, 1980, N65V departed Tampa International Airport on a chartered business trip to Lake City, Florida.[2] On board were pilot David Mellish[3] and passenger W. Daniel Stephens. En route to Lake City, N65V made an intermediate stop at Bartow Airbase to pick up another passenger John J. Daley, Jr. Due to adverse weather conditions, however, N65V was unable to land at Lake City and was directed by the Jacksonville Air Route Traffic Control Center (Jacksonville Center)[4] to proceed instead to Gainesville Regional Airport.
 
 
 3
 The weather conditions in Gainesville that morning were also poor, with a low cloud ceiling and fog cover contributing to limited visibility. Nearing the Gainesville Airport at approximately 9:32 a.m., N65V was cleared for an instrument landing system (ILS) approach to runway 28.[5] Several minutes later, the Gainesville local controller issued Mellish an alternate missed approach instruction to follow in the event he was unable to execute a landing.[6] When Mellish reported at 9:44 a.m., that he was at the outer market inbound,[7] N65V was cleared to land on runway 28.
 
 
 4
 During the attempted landing at 9:46:41 a.m., Mellish declared a missed approach. Ten seconds later the local controller instructed Mellish to "now execute the published missed approach" thereby, in effect, cancelling the earlier alternate missed approach instruction. Receiving no response, however, the local controller asked "did you copy sir." Mellish responded, "Roger I've got a little trouble here." When asked the nature of the trouble, Mellish reported at 9:47:13 a.m., "Got an engine out."[8]
 
 
 5
 Following the "engine out" announcement, the local controller issued Mellish a priority clearance to return directly to the outer marker for an ILS approach to land on runway 28, maintaining 2,000 feet "if able". There was no response. As a result, the local controller made another transmission: "Twin Beech six five victor Gainesville Tower." Mellish immediately responded, "I'm still with you but I'm having trouble getting the engine feathered."[9] The local controller once again issued the priority clearance to return to the outer marker. At 9:48:08 a.m., Mellish responded to the clearance with the call sign of his airplane, "Six five victor."
 
 
 6
 Seven seconds later, however, there was no response when the local controller asked Mellish to state the number of "souls on board" and the "amount of fuel you have." All further transmissions by the Gainesville air traffic controllers to N65V also remained unanswered. At 9:48:45 a.m., the Gainesville flight data controller sought radar assistance from the Jacksonville Center. It was too late. It was subsequently learned that N65V had collided with the guy wire of the television antenna tower and crashed at approximately 9:48:15 a.m.[10] All on board were killed by the impact and resultant fire.
 
 II.
 
 7
 In its memorandum opinion, the district court found that from the time N65V lost an engine on a missed approach in instrument flight conditions it was in an emergency situation, and the Gainesville air traffic controllers were aware of this emergency from the time of Mellish's "engine out" announcement. The court further found that from the time of the announcement until N65V crashed, the controllers did not know N65V's position, altitude or heading although they knew, or should have known, that on any of the missed approach instructions N65V had been given it would be proceeding in a westbound direction that would put it in the general vicinity of the television antenna towers. Under these circumstances, the district court concluded, the controllers had a duty to undertake reasonable efforts to immediately determine N65V's exact location, through pilot verification or radar assistance, and to warn its pilot of the danger presented by the television antenna towers. The controllers' failure to render such assistance, the court found, constituted negligence which was a proximate cause of the crash.
 
 
 8
 On appeal the United States contends that the district court erred in formulating the duty of care owed by the controllers and that its factual findings of controller negligence, by breach of that duty, and proximate causation are clearly erroneous. We disagree.
 
 III.
 
 9
 1. Duty of Care.
 
 
 10
 The nature and extent of the duty of due care which air traffic controllers owe pilots and their passengers is a question of law, Miller v. United States, 587 F.2d 991, 995 (9th Cir.1978), and thus freely reviewable on appeal. In aviation cases, the law is that "[l]iability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care." United States v. Schultetus, 277 F.2d 322, 325 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). "[T]he duty to exercise due care to avoid accidents is a concurrent one resting on both the control tower personnel and the pilot." Mattschei v. United States, 600 F.2d 205, 208 (9th Cir.1979).[11] Under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b),[12] the applicable law governing the liability of the United States for the acts and omissions of its air traffic controllers is that of Florida. The duty owed is, therefore, Florida's "traditional ... standard of reasonable care, that which a reasonably careful person would use under like circumstances." Sergermeister v. Recreation Corp. of America, 314 So.2d 626, 627 (Fla. 4th Dist.Ct.App.1975) (emphasis deleted), cert. denied, 328 So.2d 844 (Fla.1976).
 
 
 11
 According to the United States, the district court in this case "increased the standard of care owed by the controller[s] ... from 'ordinary care' to the duty to exercise an incomprehensible degree of human perception or clairvoyance," by imposing a duty "to foresee that a pilot ... will fly his aircraft ... at an unsafe altitude directly into a television tower...." This argument, however, ignores the circumstances confronting N65V's pilot, namely the emergency resulting from engine failure on a missed approach in instrument flight conditions; circumstances which the court determined must be taken into account in formulating the duty owed by the controllers. Thus, the court did not increase the standard; rather it simply recognized that while "[t]he standard remains one of reasonable care under the circumstances ... the circumstances in an emergency are different and it is reasonable to pay greater attention to an aircraft known to be in distress." Daley, slip op. at 44 (emphasis added). The court's recognition that the duty of care owed is commensurate with the risk involved is in accord with Florida law. See Marks v. Delcastillo, 386 So.2d 1259, 1263 n. 8 (Fla. 3rd Dist.Ct.App.1980), review denied, 397 So.2d 778 (Fla.1981); see also Himmler v. United States, 474 F.Supp. 914, 928 (E.D.Pa.1979) ("[a]lthough the obligation imposed upon air traffic control may seem to be exacting and heavy, it must be remembered that the degree of care required to constitute ordinary care increases according to the dangers to be reasonably apprehended in given situations."). Moreover, the precise nature of the assistance which the court concluded the controllers owed under the circumstances was not, as the United States insists, a matter of judicial speculation; it was required by the provisions of the United States' own Air Traffic Control Manual (1980) (ATCM). See Gill v. United States, 429 F.2d 1072, 1075 (5th Cir.1970) ("[T]he government's duty to provide services with due care to airplane pilots may rest ... upon the requirements of procedures manuals spelling out the functions of its air traffic controllers....").
 
 
 12
 Under Chapter 8 of the ATCM, which prescribes procedures for handling emergencies, the United States' controllers are required to "[o]btain enough information to handle the emergency intelligently," section 1.1551; to "[p]rovide maximum assistance to aircraft in distress," section 1.1552; to "[e]nlist the services of available radar facilities," id.; and to obtain any "pertinent information" about the aircraft--including position, altitude and heading--"as necessary," section 2.1570. In addition, under Chapter 2, section 1.22, the controllers are required to "[g]ive first priority ... to the issuance of safety advisories." Section 1.33 note 1, requires the controllers "to remain constantly alert" for situations requiring such a safety advisory; and, pursuant to section 1.33 note 3(a), to issue such an advisory "if you are aware the aircraft is at an altitude which ... places it in unsafe proximity to ... obstructions."
 
 
 13
 In sum, as the ATCM spells out, the duties imposed upon the United States' controllers in this case were to determine the location of N65V and to warn its pilot of the television towers. Therefore, we find the district court did not err in concluding that reasonable care under the circumstances required reasonable compliance with the United States' own self-imposed standard of care.
 
 
 14
 2. Negligence and Proximate Causation.
 
 
 15
 The district court's "application of the legal standard [of due care] to the facts of the case (i.e., the determination on the ultimate question of negligence) is reviewed under the 'clearly erroneous' standard," Miller v. United States, 587 F.2d 991, 994 (9th Cir.1978), as is the determination of proximate causation. See Delta Air Lines, Inc. v. United States, 561 F.2d 381, 394 (1st Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); Fed.R.Civ.P. 52(a). For a finding to be clearly erroneous, the reviewing court, looking at all the evidence, must be "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). As the Supreme Court recently cautioned:
 
 
 16
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 17
 Anderson v. City of Bessemer, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Moreover, the Supreme Court further admonished that when a trial court's finding is based on credibility determinations, "that finding, if not internally inconsistent, can virtually never be clear error." --- U.S. at ----, 105 S.Ct. at 1513. Applying the foregoing principles to the instant case, we are unable to conclude that the district court's findings of negligence and proximate causation are clearly erroneous.
 
 
 18
 We note at the outset that the crux of the United States' challenge on this appeal goes to the district court's finding that N65V's loss of an engine on a missed approach in instrument flight conditions was an emergency which required assistance from air traffic control beyond that of simply issuing N65V a priority clearance to land. This challenge, however, is easily disposed of as there is ample evidence in the record to support the court's finding that a reasonably careful controller would have done more to assist this aircraft.
 
 
 19
 First, there is no question in the record that N65V's pilot, in a light twin engine aircraft with an engine out and unfeathered propeller, was confronted by an emergency which required all of his attention and skill. The Gainesville controllers conceded at trial that the engine loss on a missed approach constituted an emergency and one of the United States' own experts emphasized the seriousness of the emergency as follows: "It was a matter of survival. He was struggling to keep it [N65V] aloft, to keep it straight, to keep from reaching that critical VMC [velocity minimum control] and losing total control." Moreover, during this emergency the record is also clear that the Gainesville controllers did not know N65V's position, altitude, or heading.[13] What the controllers did know, the evidence shows, was that N65V was somewhere west of the airport in the general vicinity of the television towers, the highest of which was 1,049 feet; that visibility was poor; and that with an engine out and unfeathered propeller N65V would have great difficulty climbing and turning.
 
 
 20
 Under these circumstances appellee's expert witnesses, whose testimony the court expressly credited, concluded that the Gainesville controllers could have, and given the requirements of the ATCM for the handling of emergencies and the issuance of safety advisories, should have done more to assist N65V. These same experts concluded that had N65V's pilot received a warning of the television towers he could have safely flown, as he had indeed done for approximately a minute and a half of the emergency before the collision, and safely landed N65V. Thus, based upon the ample evidence of controller inaction in the face of a known emergency and a known danger, and the testimony of appellee's experts, the district court found that the Gainesville controllers had breached their duty of care and, thereby, proximately caused the death of Mellish and his passengers.[14] Our review of the record leaves us convinced that the district court did not make a mistake and, therefore, its findings of fact in this case are not clearly erroneous.
 
 IV.
 
 21
 In conclusion, we find no error in the district court's formulation of the air traffic controllers' duty of care. Nor do we find the district court's factual findings of controller negligence and proximate causation clearly erroneous. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Appellees also alleged negligence in the preparation of the United States instrument approach chart for runway 28 at the Gainesville Regional Airport, and they prevailed before the district court on this additional claim. In its memorandum opinion, Daley v. United States, No. 81-1117, slip op. at 44-49 (M.D.Fla. April 8, 1985), the district court found that the published chart in question incorrectly depicted the plan (top) view of the missed approach, a route flown by pilots when an instrument approach cannot be completed to a landing, in that it did not show a required left turn. This failure to depict the left turn resulted, the district court found, in N65V's pilot being directed to climb on the missed approach directly towards, rather than away, from the 1,049 foot television antenna tower in question located seven miles northwest of the western most edge of runway 28. The parties agree, however, that the district court's finding of negligent charting as a proximate cause of the crash is separate and independent from its finding that air traffic controller negligence proximately caused the crash. Accordingly, because we affirm the district court's latter finding we do not need to reach, and consequently express no opinion, as to the multiple issues raised by the United States on appeal concerning the negligent charting finding
 
 
 [2]
 N65V's final flight was under instrument flight rules (IFR) which must be used when weather conditions preclude flight under visual flight rules. See 14 C.F.R. Sec. 91.105 (1985). When flying under IFR weather conditions the pilot navigates through the use of onboard instruments, rather than visual reference, and must maintain radio contact with the air traffic control system. See 14 C.F.R. Sec. 91.125
 
 
 [3]
 Mellish was employed by Tampa Air Center, Inc., which owned and operated N65V. It is undisputed that Mellish, a veteran Air Force test and combat fighter pilot who held a commercial airplane certificate with multiengine and instrument ratings, was a competent and highly experienced pilot
 
 
 [4]
 The Jacksonville Center provides air traffic control services to aircraft while they are en route under IFR conditions. When an aircraft nears its destination it is transferred to an approach control facility such as, in this case, Gainesville Tower. Although at the time of the crash the Gainesville airport was a non-radar facility, radar assistance was available to the air traffic controllers in the Gainesville Tower by a direct telephone line to the Jacksonville Center
 
 
 [5]
 As explained by the district court, an ILS approach, "as distinguished from a visual approach, is one whereby aircraft instruments receive information from ground based transmitters and the aircraft instruments provide guidance to the runway." Daley, slip op. at 10
 
 
 [6]
 The controller manning the local position in the Gainesville Tower provides service to landing and departing aircraft. The alternate missed approach instruction he issued Mellish was a necessary contingency instruction at that time because an airplane which had attempted an ILS approach immediately prior to N65V had just declared a missed approach, and would be following the published missed approach. Like the published missed approach as depicted in the approach chart, see supra n. 1, the unpublished alternate missed approach also required the pilot to climb westbound in the direction of the television antenna towers
 
 
 [7]
 The outer marker inbound, a navigational marker known as Wynds, is located approximately 4.7 nautical miles directly east of the approach end of runway 28 at the Gainesville airport. It is one of four basic ground component transmitters of the ILS, see supra n. 5, and it provides a visual and audible signal to the pilot which is received in the cockpit when the aircraft flies over the transmitter for the outer marker
 
 
 [8]
 There was no conclusive evidence as to when the engine problem first began, what caused it, how it progressed, which engine was affected, or how Mellish responded in the cockpit to the engine loss. The evidence does reflect, however, that a light twin engine airplane, such as N65V, with an inoperative engine has only marginal climbing and turning capability. Although Mellish never declared an emergency, the local controller testified at trial that he immediately treated the "engine out" announcement as an emergency
 
 
 [9]
 The feathering of an engine is the activation of a mechanism which turns the propeller blades so that they present a knife edge to the wind reducing drag and improving the airplane's ability to climb
 
 
 [10]
 Because of the weather conditions the controllers in the Gainesville tower never saw N65V during its final flight. There were, however, two eyewitnesses who were in the vicinity of the crash scene who testified at trial as to the last seconds of the flight. One eyewitness said he could only make out N65V's image as it flew westbound in the clouds. According to the other eyewitness, who was closer to the television towers, N65V came out of the bottom of the clouds and flew for only five to ten seconds before colliding with the 1,049 foot tower's guy wire
 
 
 [11]
 We note that in United States v. Schultetus, 277 F.2d 322, 328 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960), our predecessor court indicated that air traffic controllers may even owe a greater duty than pilots in situations, such as here, where a pilot is operating under IFR conditions
 
 
 [12]
 28 U.S.C. Sec. 1346(b) provides that the United States is liable in tort for injury which is the result of "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment ... if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
 
 
 [13]
 That the controllers did not know this information is clearly established, as the district court found, by the following colloquy between the Jacksonville Center and the Gainesville Tower. The first question which the Jacksonville Center asked the Gainesville flight data controller when he called for assistance was, "Okay, where is he now"; the answer was, "I don't know...." The second question asked by the Jacksonville Center was, "what altitude is he"; the answer was, "Ah we gave him two thousand." The Jacksonville Center again asked several seconds later, "what altitude is he"; the answer was, "He was cleared for the approach and lost an engine and ah we believe he circled back around towards Wynds at two thousand." (emphasis added)
 
 
 [14]
 We note briefly that the United States asserts that N65V's pilot was a negligent cause of the crash for allegedly failing to follow air traffic control clearances and violating various federal regulations requiring him to operate his aircraft safely. The district court rejected the United States' assertion of pilot negligence, finding that Mellish's conduct was reasonable under the circumstances of this case. Given the emergency situation confronting Mellish we find no clear error in the district court's finding