[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 22-12316

————————————

PERRY W. HODGES,
AURORA CECILIA SCARPATI RIPALDA,
as Personal Representative of the Estate of
Carlo Alfredo Zanetti Scarpati, deceased,
MARLENIS SANCHEZ,
PEDRO SANCHEZ,

Plaintiffs-Appellants,

MONICA D. DOMINGUES,

Plaintiff,

*versus*

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-21893-DPG

_____

Before ROSENBAUM, BRANCH, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

On July 17, 2018, two airplanes—a Seneca and a Cessna—collided mid-air, tragically killing the pilots and passengers in both planes. The Seneca was piloted by Nisha Sejwal, with Ralph Knight accompanying her. The Cessna was piloted by Jorge Sanchez, with Carlo Scarpati, a student pilot, also on board. Both planes were "VFR" aircraft operating under standard visual flight rules.[1] The Seneca was departing from, and the Cessna was arriving at, the Tamiami Airport (now known as the Miami Executive Airport) when the collision occurred. The representatives of the pilots' estates filed suit against the United States under the Federal Tort Claims Act ("FTCA"), alleging negligence on the part of Federal Aviation Administration ("FAA") air traffic controllers at the

---

[1] Under visual flight rules ("VFR"), pilots receive guidance from air traffic controllers in the form of traffic advisories and safety alerts while inside the airport's jurisdiction, but still retain discretion over routes and altitudes during flight. Compared to instrument flight rules, which impose a "highly structured environment" in which a pilot is in constant contact with air traffic control, VFR grants pilots a greater degree of flexibility.

Tamiami Airport. Following a bench trial, the district court entered judgment in favor of the United States, and the Plaintiffs appealed. After careful review and with the benefit of oral argument, we affirm.

## I.   Background[2]

### A.  *Air Traffic Control Practices and Procedures*

As part of its mission to ensure "the safety and efficiency" "of the use of the navigable airspace" of the United States and to "promote safe flight of civil aircraft in air commerce," the FAA operates a national air traffic control system which services pilots from various facilities, including air traffic control towers. 49 U.S.C. §§ 40101(d)(4), (6), 44701(a). The Tamiami Airport, located in Miami-Dade County, Florida, is staffed by FAA employees, including air traffic controllers who work in the Tamiami Tower and manage air traffic that is largely flying under VFR. The prescribed practices and procedures of FAA air traffic controllers are set out in FAA Order JO 7110.65, which we will refer to as the "Air Traffic Control Manual" or "ATCM." This Order is routinely updated and superseded, and the version in effect on the date of the crash was JO 7110.65X, Change 1. The provisions contained in the

---

[2] We recount the facts as presented to the district court at trial. On appeal from a bench trial, we review issues of law *de novo* and review issues of fact for clear error. *Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144, 1149 (11th Cir. 2018) (citing *Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1319 (11th Cir. 2001)). This standard provides that "we may reverse the district court's findings of fact if, after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." *Id.*

ATCM "appl[y] to all [Air Traffic Organization] personnel and anyone using [Air Traffic Organization] directives." ATCM § 1-1-2.

FAA facilities operate inside jurisdictional boundaries, and each facility is responsible for the aircraft operating inside its respective jurisdiction. The Tamiami Airport operates inside what is known as Class D (or Class Delta) airspace,[3] and, according to evidence put forth at trial, the air traffic controllers stationed at Tamiami Tower are responsible for controlling the aircraft within that jurisdiction. The Tower's airspace is cylindrical, extending 2,500 feet in the air, with a radius of 3.5 nautical miles, meaning that it ends about four standard miles from the airport.

While in Class D airspace (both when arriving and departing), pilots are required to establish two-way radio communications with the Tower and maintain that connection while operating inside Class D airspace. 14 C.F.R. § 91.129(c)(1) ("Each person must establish two-way radio communications with the [air traffic control] facility . . . providing air traffic services prior

---

[3] According to FAA Order JO 7400.2, controlled airspace is divided into various classes, Class A through Class E, with Class A being the most restrictive and Class E being the least restrictive. Class D airspace is defined as "[g]enerally, th[e] airspace from the surface to 2,500 feet above airport elevation . . . surrounding those airports that have an operational control tower." Order JO 7400.2 § 14-1-2(d). Each Class D airspace area "is individually tailored[.]" *Id.* Class E airspace, on the other hand, includes "[s]urface area designation for an airport where a control tower is not in operation and for non-towered airports." *Id.* § 14-1-2(e). For purposes of this case, the crash occurred in Class E airspace.

to entering that airspace and thereafter maintain those communications while within that airspace."). When no longer in Class D airspace, however, pilots are not obligated to monitor the Tower's radio frequency and do not need to seek permission from the Tower to switch frequencies. Aeronautical Information Manual ("AIM") § 4-3-2(a) ("In the interest of reducing tower frequency congestion, pilots are reminded that it is not necessary to request permission to leave the tower frequency once outside of . . . Class D surface areas."); *see also* 14 C.F.R. § 91.129(c)(2)(i).

The Tamiami Tower provides service from 7:00 a.m. to 11:00 p.m. daily, meaning that if an airplane is taking off from or landing at the Tamiami Airport outside of those hours, the pilot will not have the benefit of air traffic controller assistance. But during business hours, air traffic controllers are responsible for separating and sequencing airplanes in the "traffic pattern,"[4] *i.e.*, ensuring that there is sufficient space between aircraft to prevent collision. The "traffic pattern" or "pattern" is a circuit or path around a runway in which controllers sequence aircraft for take-off and landing. *See* AIM fig. 4-3-3. The FAA's air traffic control expert witness testified that controllers are responsible for maintaining separation between VFR aircraft "between departures and arrivals[,] and arrivals and departures," but "[t]hey do not receive any separation [while] airborne in the" Tower's airspace.

---

[4] The ATCM defines "traffic pattern" as "[t]he traffic flow that is prescribed for aircraft landing at, taxiing on, or taking off from an airport." ATCM at PCG T–7.

Air traffic controllers generally use various instructions to provide their sequencing and separation services for aircraft in the pattern. For instance, the ATCM sets forth "phraseology" for controllers to use when communicating with aircraft to "[e]stablish the sequence of arriving and departing," such as "cleared for takeoff," "follow," "circle the airport," "make left/right," "go around," and "cleared to land." ATCM § 3-8-1. To provide these services, air traffic controllers primarily use their naked eye from their position in the tower—sometimes aided by binoculars. Tower radar display, also referred to as "tower display workstation" or "TDW," is a tool used to assist local air traffic controllers in locating aircraft that are too far away from the Tower to see with the naked eye. FAA regulations permit, but do not require, air traffic controllers to use tower radar display. *See* ATCM § 3-1-9(a) ("Uncertified tower display workstations must be used only as an aid to assist controllers in visually locating aircraft or in determining their spatial relationship to known geographical points.")[5]; *id.* § 3-1-9(b) (outlining permitted uses for which "[l]ocal controllers *may* use certified tower radar displays" (emphasis added)). Instead, the majority of air traffic controllers' time and effort in fulfilling their responsibilities is spent visually scanning the runways and "surface area." ATCM § 3-1-9(b)(4), note. For purposes of this case, the "surface area" is the airspace contained

---

[5] Plaintiffs do not contest that the ATCM permits but does not require the use of tower radar display.

within the Tamiami Tower's airspace boundary beginning at the surface and extending upward.

While the Tamiami Tower is equipped with tower radar display, it is not a true radar facility that provides radar tracking throughout the entire duration of a flight. Radar tracking, or "Flight Following," is available by request from the nearby Miami Approach located near Miami International Airport. "Flight Following" services provide pilots with traffic advisories, safety alerts, weather information, and radar monitoring and surveillance throughout the duration of the flight. In this case, neither aircraft involved in the crash requested Flight Following and thus were not receiving those radar-tracking services at the time of the crash. Once outside the Tamiami Tower's airspace, the pilots themselves are solely responsible for maintaining vigilance to "see and avoid" other aircraft to prevent collisions.

Another tool air traffic controllers utilize when providing separation and sequencing services in the traffic pattern, including at Tamiami Tower, is called a "flight strip" or "flight progress strip," which helps the controllers keep track of the planes and coordinate their departures. The flight strips are physical forms containing information about a certain plane, such as the plane's call sign, parking location, and the relevant departure runway. When an aircraft operating under VFR is preparing to depart Tamiami Airport, the controller fills out the flight strip once the pilot of the departing aircraft calls the Tower while still on the ground. The controller then places the flight strip onto the "strip

bay," indicating that the aircraft can receive taxiing instructions and can then receive clearance for takeoff. Once the aircraft takes off and departs the Tower's airspace without conflict, the controller discards the flight strip. The ATCM does not address the precise moment at which a controller may discard a flight strip but rather instructs controllers to "remove the strips from the flight progress board when no longer required for control purposes." ATCM § 2-3-1(a).

### B. *The June 17, 2018, Crash*

FAA air traffic controllers Austin Frazao and Steven Yanker were working in the Tamiami Tower on June 17, 2018. Yanker was serving as the controller in charge with general supervisory responsibilities, and Frazao was the air traffic controller providing separation and sequencing services to the departing Seneca. Yanker, as general supervisor, was not monitoring the other controllers or the tower radar display continuously.

Sejwal, the pilot of the Seneca, was taking a practical exam for her commercial pilot certificate,[6] while her co-pilot Knight served as her examiner on the flight, which originated from Tamiami Airport. She informed the Tower that she would be flying northwest after take-off and the Tower instructed her to taxi to one of the runways. Frazao then gave Sejwal clearance to take off with the instruction to "follow" an outbound Cessna that was

---

[6] Tamiami Airport is a facility in which approximately two-thirds of the air traffic is generated by nearby aviation schools.

heading in the same direction as the Seneca and had taken off shortly before Sejwal. At no point did Frazao tell Sejwal to stop following the Cessna. When the Seneca departed the Tower's airspace, Frazao discarded the flight strip for the Seneca and the district court determined that the Seneca was no longer in two-way radio communication with the Tower at that time.

Approximately 15 seconds before the collision, an inbound Cessna piloted by Sanchez made a partial radio transmission informing the Tamiami Tower of its location. Frazao, having received the transmission, looked at the tower radar display to determine the inbound Cessna's location and realized that it was on a collision course with the outbound Seneca. Because he no longer had the Seneca's call sign (he had discarded the flight strip) and because he did not know the Cessna's call sign—either because it was not in the Cessna's transmission at all or, if the Cessna transmitted its call sign, Frazao was not able to hear or understand it—Frazao issued a general radio broadcast: "[T]raffic at your 12 o'clock, less than a mile, 1400."[7] But the call came too late; the outbound Seneca and the inbound Cessna collided in midair, killing the pilots and passengers in each plane.

At the time of the collision, both planes were outside the Tamiami Airport's Class D airspace (and thus outside the Tower's territorial jurisdiction), approximately 9.4 nautical miles away from the airport. The crash occurred in the Class E airspace controlled

---

[7] "1400" refers to the distance away from the Tamiami Tower the Seneca was located at that time.

by Miami Approach located near Miami International Airport. Both planes were equipped with Traffic Information Service ("TIS"), which is a system that notifies a pilot within 30 miles of a major airport if other planes are approaching it, but it is not clear from the record whether the devices in each plane were operational or in use at the time of the crash.

## C. Procedural History

This case originated as four separate lawsuits, each filed by the representatives of the pilots' and passengers' estates individually, in May and June 2019. Each Plaintiff asserted a single cause of action for negligence against the United States under the FTCA. The United States filed its answers and affirmative defenses, and the district court consolidated the actions in August 2019. One of the Plaintiffs settled her claim in August 2020, leaving three Plaintiffs in the consolidated action.

The remaining parties proceeded to a bench trial which lasted for a total of eleven days spanning August, October, and November 2021. The district court issued its findings of fact and conclusions of law orally at the hearing, entering judgment in favor of the United States in May 2022. The district court concluded that Plaintiffs' claim failed because Plaintiffs did not meet their burden of proving that the air traffic controllers breached a duty to the pilots and, even if they did breach a duty, the district court was "unable to find that any breach was the proximate cause of the [decedents'] death or deaths."

First, the district court concluded that the air traffic controllers did not owe any duty to the pilots because both planes were operating outside the airspace that is the territorial jurisdiction of the Tamiami Tower. The district court acknowledged that there was some evidence in the record that Frazao had previously given traffic advisories to planes outside the Tamiami Tower's territory, but "it simply [did not] change [the] finding" that the controllers did not owe a duty to the pilots once they exited the Tower's airspace.

As far as the relevant standard of care, the district court noted that there was no evidence "that the air traffic controllers violated any specific rules or regulations of the FAA, [the] Tamiami Airport, or the air traffic controllers' manual," but also acknowledged that the absence of a violation did not necessitate a finding of no negligence.

With respect to the alleged acts of negligence—Frazao's "follow" instruction to Sejwal and his alleged "fail[ure] to delete the instruction, placing [the outbound Seneca] in the path of the inbound Cessna"—the district court concluded that "it [was] simply not reasonable . . . to believe that [Sejwal] would have simply followed Mr. Frazao's instruction to . . . follow [the outbound Cessna] indefinitely outside the [Tower's] Class D[] airspace." Therefore, the district court held that Frazao did not "deviate[] from the standard of care by giving his general instruction to follow the outbound Cessna under these circumstances."

The district court then considered whether the air traffic controllers' failure to issue a timely safety alert or traffic advisory despite the planes' proximity to each other was negligent and whether the controllers were obligated to monitor the tower radar display in order to observe the planes' proximity and issue alerts or advisories as appropriate. The district court reiterated that both planes were outside the Tamiami Tower's jurisdiction and that Frazao was not aware of the inbound Cessna until it radioed seconds before the collision. The district court concluded that while it was "clear and imminent that [a] collision was going to occur," it "simply [could not] find, as a matter of law, that an air traffic controller at a Class D[] airport must review a [tower radar display], a device that they are not required to use, at any particular interval or for any particular length of time." The district court also noted that neither the Seneca nor the inbound Cessna had requested Flight Following from Miami Approach.

Given the foregoing, the district court concluded that (1) the air traffic controllers did not breach any duty of care owed to the pilots, and (2) Plaintiffs did not show that Frazao's or the other air traffic controllers' conduct "was the proximate cause of the collision," specifically finding that the "follow" instruction was not the proximate cause of the collision.

Lastly, the district court made note of what it called "conflicting evidence" in the record, including that "[t]here [was] an issue about whether the Seneca . . . [was] on Tamiami's frequency when the collision occurred in Class E airspace" (outside

the Tower's airspace) such that it was not clear whether the pilots would have heard any transmissions from Frazao. The district court did not make an explicit finding resolving that issue. However, the district court stated that Plaintiffs' expert testified that it takes 12.5 seconds for a pilot to "see and avoid" a crash, and the FAA's expert testified that Frazao learned of the inbound Cessna about 9 seconds before the collision, such that by the time Frazao heard the transmission, the crash was inevitable. The district court also noted there was testimony that there were "no reported problems with the TIS system on the Seneca when it was used on an earlier flight that day." Having noted those facts from the record, the district court concluded that "while there is some evidence to support the [P]laintiffs' claims, the [P]laintiffs bear the burden of proof in this case, and even by a preponderance standard, I just simply cannot find that the [P]laintiffs have tipped the scale in their favor[.]"

Plaintiffs timely appealed.

## II.   Discussion

Plaintiffs raise five issues on appeal, arguing that the district court erred in concluding that: (1) the air traffic controllers did not owe or breach any duty of care to the pilots; (2) Frazao was not negligent in issuing but failing to rescind the "follow" instruction; (3) the Seneca was no longer in communication with the Tamiami Tower after leaving Class D airspace; and (4) Plaintiffs had not proven proximate causation. Plaintiffs also contend that (5) the

district court erred by considering what Plaintiffs claim was evidence of comparative negligence.  We discuss each in turn.

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error."  *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015) (quoting *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009)).  "A factual finding is clearly erroneous if, after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed."  *Id.* (quotation omitted); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quotation omitted).

A district court's finding of negligence is a factual finding that we review for clear error.  *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1321 (11th Cir. 1989) ("[W]e apply the clearly erroneous standard to the district court's finding of negligence.").  "In determining the appropriate standard of care, [however,] we are free to review the district court's conclusion" and we thus review *de novo*.  *Id.*; *see also Daley v. United States*, 792 F.2d 1081, 1085 (11th Cir. 1986) ("The nature and extent of the duty of due care which

air traffic controllers owe pilots and their passengers is a question of law[.]").

The claims in this case are asserted under the FTCA, which provides that the United States is liable in tort for injury resulting from "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). We must identify "an analogous state tort cause of action" in an FTCA case. *Zelaya v. United States*, 781 F.3d 1315, 1325 (11th Cir. 2015); *see also Cedant v. United States,* ___ F.4th ____, No. 21-12661, 2023 WL 4986402, at *1 (11th Cir. Aug. 4, 2023). This is a negligence action, and, under Florida law, which applies here, Plaintiffs must prove four elements to prevail:

> 1. A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
>
> 2. A failure on the defendant's part to conform to the standard required: a breach of the duty.
>
> 3. A reasonably close causal connection between the conduct and the resulting injury. This is what is commonly known as legal cause, or proximate cause, and which includes the notion of cause in fact.
>
> 4. Actual loss or damage.

*Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (alterations adopted and quotation omitted). In this case, we examine the first three elements.

### A. Whether the air traffic controllers owed or breached any duty of care to the pilots

The first issue we consider is whether the district court erred as a matter of law in concluding that the air traffic controllers did not have or breach a duty[8] to monitor airspace outside of the Tower's airspace nor were required to monitor the tower radar display. Specifically, Plaintiffs contend that the air traffic controllers had a duty, under the ATCM, to avoid collision of aircraft generally and had a duty to monitor tower radar displays. Plaintiffs also rely on the "undertaker's doctrine" to support their duty argument, asserting that, because the controllers previously gave safety alerts and traffic advisories outside of the Tower's airspace, the controllers had a duty to perform such services with due care in this case. Plaintiffs finally argue that the controllers breached this duty, whatever the source. Each of Plaintiffs' arguments fails.

Under Florida law, a duty can arise from any one of four general sources: "(1) legislative enactments or administration

---

[8] The district court concluded that Plaintiffs did "not [meet] their burden of showing that the air traffic controllers breached their duty to the plaintiffs," as well as that "the air traffic controllers had no general duty to monitor the Seneca and inbound Cessna[.]" It also stated that it could not "find, as a matter of law, that an air traffic controller at a Class D[] airport must review a" tower radar display. We therefore review both the existence of a duty and whether the controllers breached that duty.

regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) . . . from the general facts of the case." *Clay*, 873 So. 2d at 1185 (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 n.2 (Fla. 1992)). We have held that, in aviation cases alleging the negligence of air traffic controllers, "[t]he duty owed is . . . [the state's] traditional standard of reasonable care, that which a reasonably careful person would use under like circumstances." *Daley*, 792 F.2d at 1085 (alteration adopted and quotation omitted). However, we have also held that "the precise nature of the assistance . . . the controllers owed [to pilots] . . . [is] required by the provisions of the United States' own" ATCM. *Id*. *See also id*. at 1086 (holding that "the ATCM spell[ed] out[] the duties imposed upon the United States controllers" and thus "the district court did not err in concluding that reasonable care under the circumstances required reasonable compliance with the United States' own self-imposed standard of care"); *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) ("[T]he government's duty to provide services with due care to airplane pilots may rest . . . upon the requirements of procedure[] manuals spelling out the functions of its air traffic controllers[.]").[9]

Florida law, following the Restatement (Second) of Torts, also recognizes the "undertaker's doctrine." *Clay*, 873 So. 2d at

---

[9] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions from the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

1186.[10]  The doctrine provides that "[w]henever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service . . . thereby assumes a duty to act carefully and to not put others at an undue risk of harm."  *Id.* (citing Restatement (Second) of Torts § 323 (Am. L. Inst. 1965)).  The doctrine also applies to third parties and not just to parties in privity with each other.[11]  *Id.* (citing Restatement (Second) of Torts § 324A).  The standard for the undertaker's doctrine as applied to third parties set forth by the Restatement—and followed by Florida courts—is as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a

---

[10] Two federal district courts in Florida have applied this doctrine to cases involving air traffic controllers and aircraft collisions, but we have not done so to date.  *See Abrisch v. United States*, 359 F. Supp. 2d 1214, 1226 (M.D. Fla. 2004) ("[O]nce [air traffic controllers] undertake to provide a service, even one not required by the [ATCM], under general negligence principles, air traffic controllers have a duty to provide such services with due care."); *Zinn v. United States*, 835 F. Supp. 2d 1280, 1312 (S.D. Fla. 2011) (concluding that because "[t]he FAA's controllers undertook to provide a service," they "assumed a duty" "aris[ing] under" the ATCM, "to act carefully and not to put [the plaintiff] at undue risk of harm").

[11] In this case, we are primarily concerned with the applicability of the undertaker's doctrine to third parties because there is no allegation that the controllers and the pilots were in privity with each other.  As we understand Plaintiffs' argument on this issue, they contend that because the controllers used tower radar display and provided alerts or advisories to other pilots in the past (*i.e.*, third parties), the controllers were thus obligated to provide those same services to the pilots in this case.

third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm,[12] or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[13]

---

[12] With respect to an increase in the risk of harm to the plaintiff, the Supreme Court of Florida in *Clay* considered whether a streetlight maintenance company assumed a legal duty as to a minor pedestrian who was killed by a truckdriver on a street where the streetlights were inoperable. *Clay*, 873 So. 2d at 1184. The court concluded that the maintenance company's "failure to exercise due care in maintaining the streetlights caused the roadway to be cast in darkness, thus increasing the risk that [the driver] would be unable to see [the pedestrian.]" *Id*. at 1187. Therefore, the issue of "increased risk . . . pose[d a] viable issue[] to be decided by the trier-of-fact." *Id*.

[13] In *Johnson*, Florida's Second District Court of Appeal considered the requirement that the plaintiff must have relied upon the defendant's undertaking as to third parties in order for the defendant to owe a legal duty to the plaintiff. *See Est. of Johnson ex rel. Johnson v. Badger Acquisition Of Tampa LLC*, 983 So. 2d 1175, 1186 (Fla. 2d DCA 2008). In that case, the estate of a nursing home resident claimed that two companies that provided consulting pharmacy services to the nursing home were negligent in providing those services, which led to the resident's death. *Id*. at 1178–79. The court concluded that where there was no evidence that the decedent "relied on, or

Restatement (Second) of Torts § 324A. Florida courts have noted that "[g]enerally, [the undertaker's doctrine] is inapplicable . . . where an undertaker 'was not engaged to perform a service reasonably expected to be relied upon by a stranger to the engagement.'" *Est. of Johnson ex rel. Johnson v. Badger Acquisition Of Tampa LLC*, 983 So. 2d 1175, 1186 (Fla. 2d DCA 2008) (quoting *Casamassina v. U.S. Life Ins. Co.*, 958 So. 2d 1093, 1102 (Fla. 4th DCA 2007) (alteration adopted)). The factors set forth in the Restatement (Second) of Torts § 324A(a) through (c) are fact-specific.

We first address Plaintiff's argument that the controllers had a duty to act with due care toward the pilots—even when they were no longer in the Tower's airspace. Specifically, they rely on section 2-1-1 of the ATCM, which provides that "[t]he primary purpose of the [air traffic control] system is to prevent a collision involving aircraft operating in the system." ATCM § 2-1-1(a). They also point to section 2-1-2(a), which instructs controllers to "[g]ive first priority to separating aircraft and issuing safety alerts," and to section 2-1-6, which provides that safety alerts should be issued if a controller is "aware [that an] aircraft is in a position/altitude that . . . places it in unsafe proximity to . . . other aircraft." According to Plaintiffs, it was "legal error" for the district court "to interpret

---

even knew about" the consultant pharmacy services, there was no basis for the court to find "any voluntary assumption of duties that would give to a legal duty" to the decedent. *Id.* at 1187.

[the ATCM] provisions" to apply only to the Tower's airspace where "those provisions contained no such limitation[.]"

Plaintiffs' argument ignores other evidence in the trial record. While nothing in the text of the above ATCM provisions limits the controllers' duty to prevent collisions to the Tower's airspace *only*, the district court also heard other evidence on the issue of where a controller's duty begins and ends, all of which made clear that the controllers' duty in this case ended at the boundary of the Tower's airspace. For instance, the district court heard testimony from the FAA's air traffic control expert witness, who testified that "there are definitive jurisdictional boundary lines that segregate air traffic control facilities," that controllers are "responsible for controlling aircraft within that jurisdictional boundary," and that the collision occurred outside the Tamiami Airport's territorial jurisdiction. The expert also testified that, under "standard operating procedure for Tamiami [Tower]," and under the AIM, Frazao's "responsibility end[ed] at the edge of [the Tower's] airspace," meaning that "when . . . aircraft exit [the Tower's airspace] into [Class E] airspace, [Frazao's] responsibility end[ed] there." The expert testified that pilots are instructed by the AIM that "the controller is no longer monitoring [them]" "once they leave [the Tower's airspace]" because they are not required to remain on the Tower's radio frequency.[14] The FAA's piloting expert

---

[14] The AIM supports this testimony. *See* AIM § 4-3-2(a) ("Unless there is a good reason to leave the tower frequency before exiting the . . . Class D surface area[], it is a good operating practice to remain on the tower frequency for the purpose of receiving traffic information. In the interest of reducing tower

testified that pilots outside the Tower's airspace would also not expect to receive travel advisories unless they had requested Flight Following—a service that neither of the pilots in this case requested. Frazao testified that the Seneca and the Cessna were "outside [his] jurisdiction pretty much," and Yanker, the general supervisor in the Tamiami Tower, similarly testified that "once [aircraft] leave [the Tower's airspace], I'm not speaking to them anymore." While the ATCM provisions upon which Plaintiffs rely do not squarely limit a controller's monitoring duties to their respective tower's jurisdiction, other evidence demonstrated that neither controllers nor pilots expect or anticipate a controller to monitor aircraft outside that jurisdiction.

Accordingly, we agree with the district court's conclusion that the territorial jurisdiction of the Tower limits the scope of the air traffic controllers' duty. The outer boundaries of the Tamiami Tower's territorial jurisdiction of Class D airspace mark the outer boundaries of the air traffic controllers' duty to provide monitoring, sequencing, and separation services to prevent collisions of aircraft. Thus, when considering the provisions of the ATCM in conjunction with the evidence in the record, we conclude that the district court was correct that the controllers did not owe a duty to issue safety alerts or traffic advisories to the pilots because

---

frequency congestion, pilots are reminded that it is not necessary to request permission to leave the tower frequency once outside of . . . Class D surface area[]."").

the Seneca had exited, and the Cessna had not yet entered, the Tower's airspace.

To avoid this conclusion, Plaintiffs argue that the controllers have a separate obligation to monitor tower radar display even after aircraft exit the Tower's airspace, again relying on various provisions of the ATCM. They are incorrect.

Section 3-1-9 of the ATCM provides that air traffic controllers "*may* use certified tower radar displays for" various purposes, including "[t]o determine an aircraft's identification, exact location, or spatial relationship to other aircraft," "[t]o provide aircraft with radar traffic advisories," and "[t]o provide information and instructions to aircraft operating within the surface area for which the tower has responsibility." ATCM § 3-1-9(b) (emphasis added). As an initial matter, it is clear from this section that air traffic controllers are not required to use tower radar display; rather, section 3-1-9 states that controllers "*may* use" tower radar display for certain purposes. *Id*. (emphasis added). This section does not contain any mandate or requirement that controllers monitor tower radar display at all. *Id*. The district court was thus correct when it found that air traffic controllers "are not required to use" tower radar display "at any particular interval or for any particular length of time."

Commentary to section 3-1-9(b)(4) bolsters the non-mandatory nature of the tower radar displays:

> Unless otherwise authorized, tower radar displays are intended to be an aid to local controllers in meeting

their responsibilities to the aircraft operating on the
runways or within the surface area. . . . [L]ocal
controllers at nonapproach control towers must
devote the majority of their time to visually scanning
the runways and local area[.]

ATCM § 3-1-9(b)(4) cmt. Accordingly, it is clear that the "majority"
of local air traffic controllers' time at a non-approach tower like
Tamiami Airport is used visually monitoring the airways, not using
the optional tower radar display. *Id.* And, to the extent the air
traffic controller uses the tower radar display at all, the displays are
"an aid to local controllers in meeting their responsibilities to the
aircraft operating on the runways or *within the surface area*," *i.e.*,
Class D airspace. *Id.* (emphasis added). While it is true, as Plaintiffs
argue, that the ATCM instructs controllers to devote the
"majority" of their time to scanning runways and the surface area
visually, *see id.*, and "majority" does not mean "all" of an air traffic
controller's time, it is clear from the commentary to section 3-1-
9(b)(4) that the primary responsibility of an air traffic controller is
to observe the runway and surface area visually, rather than
through tower radar display. Controllers are simply not required
to use tower radar display at all, much less to monitor aircraft
outside their tower's territorial jurisdiction.

Lastly, Plaintiffs' final argument as to duty is that Florida's
undertaker's doctrine requires the controllers to issue traffic
advisories and safety alerts outside the Tower's airspace. In so
arguing, Plaintiffs rely on Frazao's and Yanker's testimony at trial
that they had issued traffic advisories to aircraft outside the Tower's

airspace in the past. Plaintiffs also point to the testimony of the FAA's piloting expert, who testified that Tamiami controllers sometimes provide traffic advisories to aircraft outside the Tower's airspace with whom they are in two-way radio communication.

However, contrary to Plaintiffs' assertions, whether or not Frazao and Yanker (or other Tamiami controllers) had undertaken monitoring responsibilities or activities for aircraft outside the Tower's airspace in the past has no bearing on the alleged negligence in this case—as the district court correctly found.

First, Plaintiffs make no argument that Frazao or Yanker increased any risk of harm to the pilots here by previously issuing traffic advisories or safety alerts outside the Tower's airspace, and there is no evidence in the record to suggest as much. *See* Restatement (Second) of Torts. § 324A(a). Second, the record is completely silent as to whether the pilots knew that Frazao and Yanker had previously issued advisories or alerts to other pilots in the past, or whether they believed they would be receiving monitoring outside the Tower's airspace, such that they could have relied on Frazao's and Yanker's prior purported undertakings. *See id.* § 324A(c). Rather, there is evidence in the record that suggests the opposite, given that as a matter of course pilots do not expect to receive Flight Following unless they specifically request it, nor should they expect to be monitored by the Tamiami Tower prior to their entrance into or after their departure from the Tower's

Class D airspace.[15]  We therefore conclude that the district court did not err as a matter of law in concluding that the air traffic controllers did not owe a general duty to monitor the outbound Seneca and the inbound Cessna on the tower radar display while outside the Tower's airspace.  And because no duty was owed, the district court correctly found no breach.

---

[15] Plaintiffs also challenge the district court's factual finding that Sejwal, who was piloting the outbound Seneca, was no longer in two-way radio communication with the Tamiami Tower after the Seneca left the Tower's airspace as inconsistent with evidence from trial.  They contend that if Sejwal remained in two-way communication with the Tower, she could have received and heeded traffic advisories or safety alerts that Frazao was, in Plaintiffs' view, under a duty to issue.  As an initial matter, Plaintiffs are incorrect that competing evidence renders the district court's finding clearly erroneous.  The district court, as fact finder in the bench trial, was entitled to credit certain evidence over other evidence and to draw its own conclusions where the evidence permits two permissible inferences or conclusions.  *See Morrissette-Brown*, 506 F.3d at 1319.  While Plaintiffs are correct that neither party established at trial with certainty whether Sejwal was or was not tuned into the Tower frequency when she left the Tower's airspace, the district court's conclusion—supported by the evidence from the FAA's piloting expert and from Frazao—that Sejwal was no longer in two-way radio communications with the Tower was not clearly erroneous.  *See also* 14 C.F.R. § 91.129(c)(2)(i) ("Each person . . . [f]rom the primary airport . . . must establish and maintain two-way radio communications with the control tower, and thereafter as instructed by [air traffic control] *while operating in the Class D airspace*[.]" (emphasis added)); AIM § 4-3-2(a) ("In the interest of reducing tower frequency congestion, pilots are reminded that it is not necessary to request permission to leave the tower frequency once outside of . . . Class D surface areas.").

### B. Whether Frazao was negligent in issuing but failing to rescind the "follow" instruction

Plaintiffs' second challenge is to the district court's conclusion that Frazao was not negligent for issuing the instruction for Sejwal to "follow" the outbound Cessna but failing "to delete the instruction[.]" They also argue that the district court erred in determining that it would not have been reasonable for Sejwal to adhere to the follow instruction indefinitely. Because the district court found no negligence, which is a question of fact, this is an issue we review for clear error. *Keefe*, 867 F.2d at 1321.

We turn to evidence considered by the district court. First, section 3-8-1 of the ATCM provides a list of possible "sequence/spacing" instructions air traffic controllers can issue to pilots, including "follow," which informs the pilot about the "description and location of traffic." ATCM § 3-8-1. While section 3-8-1 of the ATCM does not specify whether a "follow" instruction would apply only to aircraft in the "traffic pattern," or to aircraft in flight as well, the FAA's piloting expert testified that the instruction would apply "[j]ust in the traffic pattern," that he "would not expect to follow the aircraft anywhere beyond the pattern" if he were to receive that instruction, and that a reasonable pilot would "absolutely" have the same understanding. At trial, the FAA's piloting expert testified that the "follow" instruction is generally understood to be given for the purpose of sequencing aircraft in the traffic pattern, analogizing the instruction to directions given by a parking lot attendant to a driver of a car: "[The 'follow' instruction in this case is] much like if you are leaving a parking lot

and the parking lot attendant says, 'Okay,' giving directions, 'follow that car out of the parking lot[.]'" He also testified that, upon receiving a "follow" instruction from air traffic control, no reasonable pilot would understand the directive to apply indefinitely, again returning to the parking lot analogy: "[Y]ou are going to follow that [car] out of the parking lot in sequence, but you are not going to follow them all the way to their home." In other words, a pilot to whom air traffic control issued a "follow" instruction would understand that air traffic control was instructing him to follow a certain aircraft out of the pattern and then proceed on his own "route[] of flight . . . chosen by the pilot in VFR in Class D and E airspace"; he would not follow the other aircraft all the way to its destination. Conversely, Plaintiffs' piloting expert testified at trial that, "as a pilot," he would adhere to air traffic control's "follow" instruction "until further advised[.]"

Plaintiffs' air traffic control expert witness testified that Frazao "had the responsibility to remember the [Seneca] because he had issued a control instruction to follow the Cessna . . . , and until he deleted that instruction[,] he was responsible for that airplane." However, the FAA's piloting expert testified that "[n]ever in [his] flying history" has he "ever been told to stop following an aircraft." Frazao, for his part, testified that he had given the same "follow" instruction "[s]everal times [every] day" and had never been asked by a pilot how long the instruction was intended to apply.

The district court, having been presented with two permissible views of the evidence, was entitled to credit one view over the other—in this case, the view put forth by the FAA. *See Morrissette-Brown*, 506 F.3d at 1319 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quotation omitted)). Given the evidence put forth by the FAA that the "follow" instruction would apply only to the traffic pattern, that Sejwal would be expected to adhere to that instruction only until she exited the pattern, and that no reasonable pilot would continue to adhere to the instruction indefinitely or until retracted by air traffic control, the district court found that Frazao was not negligent for issuing the "follow" instruction without then deleting it. The district court also found that it simply was not reasonable to believe that Sejwal would have interpreted the instruction as a mandate to follow the outbound Cessna out of the traffic pattern indefinitely until Frazao retracted the instruction. The record clearly supports the district court's finding that Frazao was not negligent, and the district court did not clearly err in so finding.

### C. *Whether the district considered evidence of comparative negligence*

Plaintiffs contend that language in the district court's findings of fact and conclusions of law "suggests" that it improperly considered evidence of comparative negligence—an affirmative defense under Florida law—in making its ultimate finding that the controllers were not negligent. In particular, they point to the district court's statements that there was (1) conflicting

evidence about how the planes approached each other prior to the collision and (2) evidence that both planes were equipped with TIS devices and that the Seneca's TIS device was functioning earlier in the day prior to collision. After reviewing the record and the district court's findings of fact and conclusions of law, we conclude that the district court did not improperly consider evidence of comparative negligence but rather based its decision on Plaintiffs' failure to prove the elements of their negligence claim, as outlined above.[16]

### III.    Conclusion

This is a case of a tragic mid-air collision between two airplanes outside the Tamiami Tower's jurisdiction. The district court correctly held that the air traffic controllers owed no duty to the pilots involved in the crash and breached no duty. We affirm.

**AFFIRMED.**

---

[16] Plaintiffs also challenge the district court's finding that Frazao's alleged negligence was not the proximate cause of the pilots' and passengers' deaths. Because we conclude that the district court did not err in its duty and breach findings and conclusions, Plaintiffs' negligence claims fail, and we need not address their arguments regarding proximate causation.